Kolb, Jr. v. ACRA Control, Ltd. Kolb, Jr. v. ACRA Control, Ltd. It's a question of fact regarding whether Mr. Kolb unilaterally waived his rights under his Performance Incentive Compensation Plan, which for convenience I'll refer to as PICP, through a document called the Share Purchase Agreement, which I'll refer to as the SPA. To be frank, there are strong factual arguments on both sides. And the strong factual arguments on both sides go to Mr. Kolb's knowledge and intent when signing that document. And, of course, the potential waiver therefrom. But that's exactly what these are. These are factual arguments. They're factual arguments and inferences, which are inappropriate for summary judgment. They're reserved, as the Supreme Court has repeatedly said, this is the province of the jury. The jury should be weighing facts and drawing inferences. Well, that may be true. But tell me what's ambiguous about the seller's warranties. Your client is a seller in this case. That he gave, said at the conclusion there is no agreement or arrangement or obligation to enforce which class for the present or future issues or transfer of, so forth and so on. And in some more language, I have no claim or right of action of any kind outstanding against ACRA, Ireland, etc. And to the extent, he says, I'll waive it. Your Honor, I think you have to view that in the context of both the parties to that agreement as well as the underlying factual language behind that. So if we're looking at the parties to that agreement, that's between the shareholders, as you said, the shareholders of ACRA Ireland and Curtis Wright, which is a foreign third party. The PICP is an agreement between John Kolb and ACRA Ireland. That's an employment agreement, isn't it? That's an employment agreement. It's a compensation agreement, it's called. And that's the agreement you sue on. That's the agreement. You got a one-count complaint. You have a single-count complaint, I believe, for breach of contract. Yes, Your Honor. It was a second amendment complaint. And the contract, I don't know why, what do you call it, the PICP or something? The PICP. Well, it's the contract. The contract, yes, Your Honor. You're suing on that contract. And you're saying you weren't compensated according to the terms of the contract. Exactly, Your Honor. Isn't that right? Yes, Your Honor. And the contract says that, well, the language, the extent of it is not in dispute, is it? The extent of the contractual language. How long, what's that, how long did that contract last? During the duration of employment. There's clear language in the PICP. The language, it's 1999 it was signed. Just for a minimum of time. And he worked there until 2011. Yes, Your Honor. But the testimony of the other side was it expired after five years, right? Yes, Your Honor. 2004. And they gave that up, right? Well, for purposes as conceded in an appellee's brief. For purposes of the summary judgment, the facts have to go to you or the interpretation goes to you? They do, Your Honor. Right.  Correct, Your Honor. And the testimony was he didn't get any options because the contract had expired in 2004. But for purposes of summary judgment purposes. Well, that's right. But they said that they spent 25 pages of their brief talking about the fact that the contract expired in 2004. So the company's records don't show any options accruing because the contract had expired. Somebody has to go back and reconstruct what happened between 2004 and 2011 to figure out how many options your man is supposed to have. That's fair. And if he got any options as part of his compensation, what would the records of the company reflect if they'd been corrected to show that the options were accrued? They weren't put on the record because the contract expired in 2004. But what would your man have in 2011 when he left the company if the options were reflected on there? That's exactly right. Isn't that right? Your Honor, you hit it exactly on the head. They never gave him those options. Go ahead, I'm sorry. But don't you kind of run into a brick wall with the 2010 notice of option exercise when he exercised his right to the 2,168 shares? And he said, apart from the option and the 100 shares of which I am the legal and beneficial owner, I have no other rights or entitlements in respect of shares. He said, I don't have any other rights in 2010. And now he's saying, whoops, I do. So how did he get around that? There's a two-part answer to that question. The first is that in 2010, they still never would have provided him that notice. They never would have provided him that notice. So if you go back to the PICP. But I'm saying he said he had no entitlement. And the burden is on the company to inform him that he has options available under the contract, the PICP here. It specifically says the employee will be granted options. They never informed him of that right. He never knew he had options. Did he ever ask? The burden was on the company, Your Honor. That's one of the inconsistencies here. There's a passive voice, though, in that contract. He shall be granted. It doesn't say whose responsibility it is to ascertain the entitlement. It also doesn't put an affirmative burden on Mr. Kolb to inform the company. So if the company has an obligation. Right, but he's asking for something under a contract. And he has to show that his rights were violated. And if the contract does not specify the procedure for ascertaining the profit level of the company, why is it he can just kind of sit back there and do nothing and then years later say, oh, I was owed this money? With due respect, Your Honor, the contract does specify how the amount would be determined when he gets these options. It has a metric called average turnover. And essentially that's averaging the two years of revenue. And so he just kind of sat back and waited for the company to tell him? He never asked? Your Honor, for the first five years, this company was not as profitable as they had hoped. The average turnover was not met. Mr. Kolb put his head down knowing that he just needed to get the ATO. And then it says the employer will provide the options. But he had access to all the records, at least from the record. It seems to me to be a simple calculation to determine what he was entitled to. And he had access to that material. He did. He did have access. But it's important to keep in mind that the actual number, the average turnover, was never calculated. It would not have appeared on any company document. And Mr. Kolb was not tasked with doing that. Why did he exercise that release letter then to ACRA Ireland saying, I have no claim or right of action of any kind, outstanding, or any shares in ACRA Ireland or ACRA USA or otherwise. To the extent that any claim exists, I irrevocably waive such claim. So that was executed in conjunction with the SBA. So we're moving forward now from the initial 2010 option. This is a different question with regard to the release letter. Why would you sign that letter if you might have a claim? I think Your Honor raises a very good point. He was unaware of the claim. That essentially shows that he did not have knowledge of his rights under the PICP. He forgot. He was never informed. So it's a 12-year time period. And the burden is on the company to inform him when he's hit the average turnover and provide him the options. The company never did that. The notice that he was supposed to get was the option agreement. The company's CEO. That's part of a compensation package. Was this contract signed in Maryland? It was, Your Honor. So Maryland law would apply to it. The breach of contract claim is under Maryland law. It is, Your Honor. What, does an employer have to pay the employee what it agrees to pay according to an employment contract in Maryland? It's a contract, Your Honor. So it's controlled by the normal contractual. What part of the compensation are options for stock? What did they have to do about that? Do they have to put that in the company records or put it on a W-2 form or inform the Internal Revenue Service or anything like that? I would argue that it's... So what's the law? I'm asking you. I don't know. Under Maryland law or under federal law, what do they have to put down? It's compensation according to this agreement. It's a compensation agreement. It says compensation. The government sends me a W-2 form at the end of the year. That's my compensation. Here he was supposed to get options. I'm an Irish company, so this is an Irish company. I know it's an Irish company, but it's under Maryland law. You're exactly right, Your Honor. So the agreement would have been controlled by Maryland. If he gets a W-2 form and he earns compensation in 2008, he's supposed to pay tax on it. But he never received that compensation, Your Honor. So that's exactly why we're here today, because ACRA Ireland never provided him those options. So there was no record of it. Mr. Kolb had no notice of it. If he had received that form... If the employer doesn't pay what it agreed to pay, and the employee doesn't complain, does he forfeit under Maryland law? Does he forfeit the right to compensation? The remedy is breach of contract, and that's exactly why we took this matter to the district court. Maybe there's a statute of repose or a statute of limitations or something that runs if the employer... Of course there is, Your Honor. If the employee doesn't get paid and he doesn't complain. That has not been raised by FLEs. There's been no argument about statute of limitations. It's there anyway. Your Honor, to my knowledge, the last breach of the contract, to answer Justice Keenan's question earlier, was 2011. So he would have had a full accrual of options since the 2010 option agreement that he signed. So after 2005, I believe, the company's really hitting a high profit margin. That document that she read, she's broad enough to cover it even if he forgot it. Which document are you talking about? The one that she read from there, the release. That's an agreement between John Kolb and Curtis Wright, the company that was... That didn't run to... But he delivered the letter to ACRA Ireland. Your Honor, it was executed in conjunction with the SPA. It was directed to ACRA Ireland. It was, Your Honor. But there would have been no consideration for that agreement as well. To the extent you're trying to construe that as an agreement between the two companies, he would have... I'm not saying it's an agreement. It's his declaration that he just doesn't have any outstanding interest. At the end of the day, we have to be controlled by contract here, though. So to the extent that he's... But under the summary judgment view of the light most favorable to you, how do we look at that?  What you're saying is I forgot? There's a statement, I forgot. Does that get you to a jury trial? It is not just I forgot here. We need to be very clear about that. It's that they did not inform him of his rights under the PICP. So it's not just I forgot about the PICP or the contract here. He may very well have forgotten about that, but it's the rights under the option agreement why we're here today. He was owed rights, and the burden was on the company to give him those rights. The only notice that was... If he didn't get those rights that he was entitled to, when they sold the company, somebody got the... or sold the stock, somebody got the benefit of his option. They received $4.6 million. All this year... I'll be finished. I'm sorry. I apologize. I'm trying to... Somebody got the benefit or something got the benefit of his $4.6 million. Yes, Your Honor. Who is the beneficiary? Is it the Ireland or Curtis? Was it Curtis Wright? Curtis Wright. No, Your Honor. Curtis Wright gets $4.6 million? It would be all the shareholders back for Ireland. The other shareholders? Yes. Because their shares were worth more than it would have been if it had been diluted, if he had been issued this stock. Exactly, Your Honor. If he had exercised the option. So $4.6 million that he didn't get went to pockets of the other shareholders. The largest shareholder was CEO Fergal Bonner. This individual is the sole individual tasked with providing Mr. Cole the options. So somebody else got the benefit? Yes, Your Honor. The person who received the highest benefit... Wouldn't it change the price to Curtis Wright at all? Wouldn't it affect them? No, Your Honor. If they had granted the options, every shareholder back for Ireland would have been proportionally diluted. So their position is you forfeited $4.6 million to the benefit of the other shareholders. But we also need to put this in context of the individual who was tasked with providing Mr. Cole the option agreement. In his deposition, the CEO acknowledged that he was the one... That's Mr. Fergal? Mr. Fergal Bonner was the one tasked with providing the option. He was the one who signed the contract. Signed the PICP, yes, Your Honor. He signed the contract that you sued on and he said it expired in 2004. He testified to that. That's his contention, Your Honor. The plain language of the contract would contradict... He said it expired in 2004. That was his interpretation of it. That's where he didn't keep the records option. And that appears to be solely his interpretation. He, by the way, is the largest shareholder back for Ireland, would have lost the most money if Mr. Cole had exercised his options. So, therefore, we have Mr. Cole who essentially was requiring notice from the guy who would lose the most if he didn't inform him. If Mr.... My time's expired, but if... Don't urge me to answer your question. If Mr. Cole had received that notice, Mr. Fergal Bonner loses the most proportionally. So, therefore, we're in this situation where Mr. Bonner's not incentivized to calculate that because if he had calculated it, he would have seen that a full option, a full 5%, would have been granted for any of the last five years. You saved some time. I did, Your Honor. Thank you. Let's let the other side get in on this. Mr. Feldman. Good to have you here, Mr. Feldman. It's nice to be here. Good morning. I'm Howard Feldman from Baltimore, Maryland, and I represent the Appalese Acra Control Limited, which is an Irish company. I'll refer to that as Acra Ireland as my... Now, is it the party to the employment contract? It is. It was signed by Mr. Bonner on behalf of your client, Acra Control Limited. That's correct, Your Honor. All right, sir. And I also represent... Which would also be the employer, then, of the plaintiff. Technically, the employer was the United States subsidiary of Acra Ireland, which Mr. Cole became the president, treasurer, and secretary of. So he would have gotten a W-2 from the United States company. The PICP, as it's been referred to, I think, was between the Irish company, which would be issuing the shares to Mr. Cole. The agreement was with Acra Control, and that's the defendant, on the breach of contract claim. Both entities are actually defendants and are Appalese here, Acra USA and Acra Ireland. But only one of them signed the contract. The PICP was signed by... The only one who signed the contract was Mr. Bonner on behalf of Acra Control Limited. So Acra Control Limited made a covenant to pay this man for his work, and as part of it, to give him options if he performed up to certain standards. And it was to be in effect for a minimum of five years during the course of employment, when the course of employment extended it to 2011. That's... Our motion is based on an assumption that the agreement... Our motion is that he was employed. You have to accept the fact that he was employed until 2011. That is correct, Your Honor. And you have to accept the fact that you never gave him any options. Not under that agreement. Not under that agreement. Didn't give him any options, and no records of the company were ever made to reflect that he earned any options. That's also correct, Your Honor. There is no question here, however, that summary judgment is appropriate. The case is cited at page 28 of our brief, made clear that issues of waiver can be decided as a matter of law, when here there's a clear written release. Can an employee in Maryland waive a right to receive wages for work performed? Employees can waive all... Under Maryland law? Yes. They can waive it? Yes. Can they waive it impliedly? That's not what has happened here. The waiver here was expressed. Can they waive it by inaction? I can't answer that question because that's not been the issue in the case, so I can't cite you chapter and verse. I'm asking you a legal question under Maryland law. You're a Maryland lawyer. I'm asking you about Maryland law. I don't know it. I think there was a question... I mean, we have enough trouble with federal law. I mean, they go over these Maryland law issues. I don't know. In West Virginia, I'm from West Virginia, and I know in West Virginia, and it came out of the coal mine history, employers don't pay the employees. It's a crime for the employer not to pay what they agree to pay. In Maryland... That's West Virginia law, I think. In Maryland, if an employer does not pay an employee wages as defined by the Maryland Wage Payment Law, it gives rise to a civil action, which could give rise to... Well, there's a rise to a civil action in West Virginia, too. You can get that civil action. I know that. But it's worse than that if they don't pay. I mean, you can't walk away from the employee. If you hire them and they work, you're supposed to pay them. I don't disagree, Your Honor. But an employee, I think, can waive any claim to any wages or a benefit if done so in writing, and I think that happens all the time where there's a dispute as to whether a benefit was earned or something like that. Here there are two key undisputable facts which support the district court's finding that summary judgment was appropriate. One, as Your Honors have pointed out, Mr. Kolb signed the Share Purchase Agreement in 2011 and the documents related to that agreement in which Mr. Kolb irrevocably waived any claim against what was defined in the agreement as a group company, and the group companies included the appellees here. And in the Share Purchase Agreement, Mr. Kolb represented and warranted to Curtis Wright, which was not a party to the PICP, and could only take the representations and warranties in good faith because it had no other knowledge of what the circumstances might have been in 1999. He represented that all material contracts were disclosed. There were no arrangements. There were no share of them. There were no option arrangements. There was no factor circumstance which could give rise to a claim, and Curtis Wright accepted those and paid Mr. Kolb 642 euro for his shares in the company. Mr. Kolb knew about the performance incentive, the PICP, the Performance Incentive Compensation Plan. He negotiated it. It was critical to him at the time he signed it and his decision to join Acura USA. And he signed it. And the focus here on whether the triggering event is what he may have been aware of is misplaced. The focus is on the entitlement he had in the contract that he knew about, at least in 1999 when he signed that. And Mr. Kolb can't run away from the knowledge of the contract rights that, if any, that he was entitled under the PICP. Whether he forgot about the PICP in later years is legally irrelevant. But you all said it expired in 2004. That's what you said during this litigation. But you agree that it has to be construed differently. So your position is it means something different than what your principal testified to. And his position is he didn't understand it. So neither side understood the contract on this record, right? Whatever the contract. You said it expired in 2004. He said he didn't understand it and didn't remember it. I'll concede if this case, if the decision on summary judgment were to be reversed, that would be a disputed issue. It's hard to actually resolve the trial, whether it be terminated. Mr. Kolb's argument that he was ignorant of whether the triggering of it, the reaching of the ATO, which is a simple calculation of averaging two numbers, two years' sales revenue, is incredible in light of the fact that, as Judge Keenan, I think, pointed out, the PICP was silent as to whether ACRA Ireland had a duty to inform him. The reality is it's a simple calculation. Is it more incredible than your position that the contract had expired in 2004 when it says a minimum of five years during the course of employment and he is employed until 2011? I think that is more incredible. It seems to me like each interpretation sounds pretty incredible. I think the language about the term of the agreement is ambiguous at best as to what was meant at that time. He was the president and treasurer. He had a contract for five years. All you've got to say is five years. I don't disagree with you on that point. This says it's a minimum of five years, which means it will be longer than five years, during the course of employment, employed until 2011. So he had a contract from 1999 to 2011. And the question is then was he entitled to these two options and can he give them up by forgetting them and put $4.6 million in the pockets of the other shareholders? He can give them up because there's a contract, and that contract gave him an entitlement to whatever it was. And when he signed the share purchase agreement, he irrevocably waived any claim he had. Curtis Wright? The share purchase agreement was between the shareholders of the company, Acra Ireland, and Curtis Wright. Does the 2010 notice of option exercise make any difference in your analysis? I think it's an important fact to understand that he's telling Acra Ireland that he has no additional claims. I'm not sure it's as relevant, Your Honor, as the letter he addressed to the directors of Acra Ireland. He told them that he had no other claims at the same time that he was exercising his right to get the 2,100-some shares, right? Under the 2010 option agreement, that's right. And you're saying that's not legally significant? I think it is legally significant. What makes it even more legally significant is he reinforced that declaration when he sent a letter to Acra Ireland in connection with the share purchase agreement saying he had no other claims. I got the July 28th letter? Yes, Your Honor. And, again, in that letter, he, again, irrevocably waived any claims to the extent he had them. Importantly, considering whether to sanction Mr. Kolb's ignorance argument, this court must consider the Pandora's box that will be open to contracting parties claiming, oops, I forgot, with respect to contract rights or any rights, not only in a merger and acquisition transaction where the corporate buyer, here owned by a public company, priced the total acquisition price for the whole company after significant due diligence and rightfully thought it was buying 100% of the stock of the company, only to later learn that a minority shareholder claims to own even more stock and wants now to be paid for it from the buyer. But also think about an everyday commercial context where waivers and releases are commonplace. Even in the context of parties to litigation who reach settlement agreements, whether of tort, contract, or statutory claims. Think about a garden variety auto tort case where plaintiffs commonly release defendants and non-defendants of claims or injuries both known or unknown. And that's permitted both under the law of Ireland and Maryland to the extent Maryland law is applicable on that point. The result here would create havoc. How would the law of Ireland get in this thing if it's a suit on a Maryland contract? Well, Irish law governs the share purchase agreement. But the suit is on the employment contract. The suit's on that 1999 contract. I understand that. Which is called a compensation agreement. And it's a one-count complaint. I understand that. Doesn't say anything about suing on any other contract. It's a one-count complaint on a 1999 contract which you all say is executed in Maryland. That's correct. So why wouldn't we just stick with Maryland law? As I said before, we have a lot of trouble figuring out Maryland law. I mean, you want us to go to Ireland and you cite House of Lords cases for Ireland law. That's English. They don't even like the English. Well, I'm not going to get into a socio-political debate with you, Your Honor. But Irish law clear and an appellant concedes that Irish law governs the share purchase agreement. There's an express provision in the agreement. But they are suing under the share purchase agreement. He's suing under this 1999 contract. But whether there was a waiver is a matter of contract under the share purchase agreement. And I think the parties are in agreement on that. The House of Lords provision, the Hiroshant case to which you refer, is persuasive authority in the absence of any Irish law. It's persuasive authority to say what Irish law is. And the district court applied it as such. And you're asking, and I'll dovetail into that, because that's the privity argument that's raised by appellant. The argument is somewhat intellectually dishonest because it ignores the July 28, 2011 letter that Judge Keenan referenced addressed to the directors of Accra, Ireland. And that letter created privity between Mr. Kolb and Accra, Ireland. And in that letter, again, addressed to the directors of Accra, Ireland, Mr. Kolb reiterated he had no claim of right of action, which would include contract rights. And to the extent he had any claims, Mr. Kolb, again, as he did in the share purchase agreement, irrevocably waived and released the companies. Now, with regard to the July 28 letter, did there have to be independent consideration for that? No, it did not. Why not? That's the Hiroshant case where a contract between a third party. You're saying if you're not, the difference between using it defensively and affirmatively. Absolutely, absolutely. And that's permitted both under Maryland law, to the extent it applies there, we briefed that, and Irish law. And in the Hiroshant case, a contract between a third party and a creditor extinguished an obligation. And in a later action by the creditor against the debtor, the debtor was permitted to raise the extinguishment of the debt as a defense to the contract. And they've not cited any cases to the contrary on that point. As explained by the district court and in our brief, Irish courts apply the objective law of contracts. In construing contracts, and I'm referring obviously to the share purchase agreement, Irish courts do not consider parties' subjective understandings and intent, but rather they assess what a reasonable person would have understood the contract to mean under the facts and circumstances surrounding when the contract, the share purchase agreement, was entered into. As an overriding objective in the field of commerce, Irish courts seek to construe contracts in accordance with business common sense. Here, it can only be said that the parties to the share purchase agreement must have understood, must have understood, that Curtis Wright was buying and Acra Ireland shareholders were selling all of the equity interests in that company, whether they're characterized as options, shares, or otherwise. And after that deal, no one of the sellers would later say, hold on, I still own a piece of the company, and if you want it, you have to pay for it, and that's what's happening here. And it's worth noting, I think it was Judge Floyd that pointed out, or Judge King, if I'm not mistaken, that had Mr. Kolb spoken up before the share purchase agreement was entered into, Curtis Wright would not have paid more for the company. I think counsel conceded that. The purchase price. You said that Curtis Wright wasn't effective at any of this. It's shareholders. It's a question of whether you're, who gets the $4.6 million, other shareholders, or whether Mr. Kolb gets some of it. Curtis Wright's affected now because the claim, for all practical purposes, is against Curtis Wright because it's now wholly owned subsidiary is going to have to pay Mr. Kolb. So that, you can argue, comes out of Curtis Wright's pocket because it's wholly owned subsidiary would lose the value of whatever he is seeking in this case. When had he spoken up earlier, the share price, the $42 million, I'm sorry, the $42 million in euro, would have just been divided, been allocated differently between ACRA Ireland's existing shareholders at the time. If the result Mr. Kolb seeks were permitted, I do not think that it can be reasonably argued that such a result would conform to business common sense. In light of the relevant factual circumstances of Curtis Wright's acquisition of what it thought were 100% of the equity interest in the company and the warranties it obtained from Seller, that these are all my interests, I irrevocably waive any claims. I'm not going to later sue your wholly owned subsidiary. The only common sense result here is that pursuant to Section 5.6 of the Share Purchase Agreement, the July 28, 2011 letter, that Mr. Kolb waived any rights under his PICP, whatever they were, at the time he signed the Share Purchase Agreement. Our expert, Mr. MacDonald, on Irish law, explained that if faced with this kind of circumstance, an Irish court would be offended by a party seeking to undo a contractual release, like Mr. Kolb seeks to do here, and that it would not grant the redress he seeks. I ask this court, likewise, to not countenance Mr. Kolb's effort to undo his contractual undertakings and affirm the district court's order granting summary judgment. And I'll rest on the argument on the motion for leave to amend unless the court has any questions. Thank you. Thank you, sir. Mr. Conaghy. Thank you, Your Honors. To address Justice Keenan's point again, your question about whether the letter itself could be construed as an agreement between ACRA Ireland and Mr. Kolb here, and the consideration that would be related with that, the simple answer is there is no consideration related with that. He signed that letter to them. You're talking about the 28th of July letter? Yes, Your Honor, the one that was executed in conjunction with the SPA. He gave them that letter, and he got nothing in return. ACRA Ireland at that point owed him $4.6 million, and he got nothing. It's a one-way letter. Right now we have a situation where ACRA Ireland's trying to retain the benefits of Mr. Kolb's work as president and CEO of its subsidiary, where he surpassed all revenue expectations and retained all of these shares for its shareholders. Appellee raised a couple other issues regarding whether the Irish law governs here or not. Irish law does not govern the PICP. Nobody's in agreement about that. To the extent Irish law has any applicability here, it's under the SPA, which is controlled by Irish law. But it's very interesting to note that Irish law precludes a third party. It's not like the American system where you can have a third-party beneficiary. It precludes a third party who's not in contractual privity to take advantage of that consideration from another's contract. Is ACRA Ireland now a wholly-owned subsidiary of Curtis Wright? Yes, it is. I understood Mr. Feldman to say. Does that make any difference in the analysis? I'm glad you brought that up, Your Honor. No, it doesn't. Tell me why not. It's a separate legal entity. In our system and in the Irish law system... In terms of privity, you're saying it's still a totally separate entity? We look at privity at the time of contracting. At the time of contracting, they were contracting to purchase the interest in ACRA Ireland. So we can't retroactively improve that. You're saying even with regard to the release letter, it still was before they became a wholly-owned subsidiary, or no? It would have been. It would have executed in conjunction with that. So it would certainly have been before. Without that, there's no transaction. So it has to be executed in conjunction with the SPS. And to that point, ACRA Ireland here is essentially, as I just said, essentially trying to parlay this into a windfall. They received the benefits, and now they're going back and trying to keep the benefits from that without providing him the options they're under. He performed. He should get the benefit of that agreement. And there are two other quick points I'd like to touch on here regarding unilateral waiver. The district court premised its decision on unilateral waiver, so not a mutual waiver, because a mutual waiver would be impossible. There was no mutual agreement between the shareholders and John Kolb. Unilateral waiver means that John Kolb waived it unilaterally through 5.6 of the SPA. But we know that the unilateral waiver is impossible because both parties got a benefit. We have first the language of the PICP. It says it continues unless it's mutually agreed in writing. And more importantly, the stock options cost 10 Irish pounds each. So ACRA Ireland, when Mr. Kolb executes the agreement and exercises the option, gets 100,000 Irish pounds. That's a pretty significant benefit. And to quote the district court from that, they said, it cannot be said that any other party would benefit if Mr. Kolb purchased shares in ACRA Ireland. We need to look at that sentence literally, and it's saying that if one party purchased something from another, the other doesn't benefit. With due respect to the district court, that's just not true. When a party engages in a transaction, both sides get something of benefit. ACRA Ireland, in this case, got the benefit of 10 Irish pounds per share. That's 100,000 Irish pounds versus Mr. Kolb getting his portion of the stake that he sought from the beginning. So these are languages of mutual benefit, and even to the extent we're construing that Mr. Kolb somehow had knowledge, which it's hard to see how he possibly could have, even if that's possible, he couldn't have waived it unilaterally because the agreement was only with the shareholders of ACRA Ireland and Curtis Wright. So that language essentially precludes unilateral waiver, which was the very basis the district court rendered its opinion. So if we look at that, it renders it essentially an impossibility. And just to back up on the one other point about Irish law here, Apelius argued that, yes, it's largely the same under Irish law and American law here. And the unilateral waiver, it's also true. You're not going to be able to do that because in any transaction, you can't just have one party waiving one side of the contract, if it's for the mutual benefit of both parties. Otherwise, it undercuts the very foundation of contracting.  Because the other side would just say, oh, I'm waiving that obligation. Just let me see if I have anything else. Oh, finally, the Irish case. How about his point that if you're right, Curtis Wright's on the hook for $4.6 million? I think, again, that goes to Justice Kegan's question that they're separate legal entities. Both Irish, they're separate legal entities. We can't just start looking, piercing the bait. I mean, if we look at that, you know, the American conglomerates here, you could draw some connection to some subsidiary far down there. We can't start looking at subsidiaries there and then seeing who's on the hook. This ACRA Ireland contracted with Mr. Cole, and they didn't fulfill their contract. It's regardless of who owes that, he has a breach of contract claim against them. I think that's almost dispositive on that issue. And just in my last 20 seconds on the Irish law case that Mr. Feldman just raised there, that's very different than the current posture of this case. In that case, consider what the House of Lords case, the Irish, I'm terrible at pronouncing. The English law case. The English law case. It's from 100 years ago. And essentially what they said there is the father paid the son's debts. And, you know, they may have taken a reduced amount. But here, no one paid Mr. Cole's debt. He never received any consideration for the amount that he was owed. In this case, it's completely different posture, whether it's used offensive or defensive. He didn't receive the benefit of anything. Thank you, Your Honors. Thank you, sir. We'll come down and greet counsel, and then we'll call the next case.
judges: Robert B. King, Barbara Milano Keenan, Henry F. Floyd